UNITED STATES of America, Appellee,

v.

Shepard BONEPARTH and J. S. Boneparth & Sons, Inc., Defendants-Appellants.

No. 315, Docket 71-1862.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1971.

Decided Feb. 23, 1972.

Arthur Richenthal, New York City, Richenthal, Abrams & Moss, New York City, on the brief, for defendant-appellant Shepard Boneparth.

Samuel N. Greenspoon, New York City, Eaton, VanWinkle & Greenspoon, New York City, on the brief, for defendant-appellant J. S. Boneparth & Sons, Inc.

Patricia M. Hynes, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., John W. Nields, Jr., and Peter F. Rient, Asst. U. S. Attys., on the brief), for appellee.

Before LUMBARD, WATERMAN and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

J. S. Boneparth & Sons, Inc. and Shepard Boneparth, sole owner of the company's common stock and its president, appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York, after a trial before Judge Lloyd F. Macmahon and a jury. The company and Shepard Boneparth were convicted of violating 18 U.S.C. § 712, which prohibits anyone "engaged in the business of collecting or aiding in the collection of private debts" from using the initials "U.S." or any name or emblem conveying "the false impression that such business is a department . . . or instrumentality of the United States." The trial judge fined the company and Shepard Boneparth $1,000 each and imposed a two week jail sentence on the latter. Appellants claim that they were denied a fair trial and that the trial judge committed errors in his charge. They further claim that 18 U.S.C. § 712 cannot fairly be read to apply to them, and that if the statute is so read, it is unconstitutionally vague. Because we conclude that the statute does not apply to these defendants, we reverse their conviction and order that the indictment be dismissed.

We reach this conclusion with a heavy heart because the record reeks from the unconscionable practices of appellants.

The company operated a furniture and appliance store in Harlem. Most of the sales were made on credit, so that liquidation of accounts receivable was a constant problem. The company did not use a collection agency but collected its own bills. Collections were pursued with understandable persistence. But when all else seemed to fail the company chose to resort to sheer trickery. It is that deception which this case is all about.

Certain delinquent customers received a form from the company that bore some resemblance to a check. It arrived in a plain brown envelope bearing the return address "U.S. Funds Bureau, Headquarters Building," with a post office box number. The form bore the legend "U.S. Funds Bureau" suitably inscribed in impressive lettering. "U.S. Funds Bureau" was in turn surrounded by equally august curlicues and margins and by the information that the "Headquarters" was "Washington 6, D.C.," and that the form was sent by the "Location and Re-Disbursement Dept." In the center appeared the advice that: "The Amount of _____ Dollars is Disbursable." The amount filled in roughly corresponded to the sum owed by the particular recipient, whose name and address were also typed in. Directly above appeared an imposing, screaming eagle, under which was the titillating legend: "This form not good for more than $1,000.00." The attached stub instructed the recipient to detach and retain until the amount there typed in (the same as on the main body of the form) "is disbursed in full." Both the stub and the form also prominently bore the real reason for their existence—the advice to answer all questions on the "reverse side of this form completely and accurately." Doing so, of course, gave the company up-to-date informa-tion as to the customer's home address, bank, employer, spouse, spouse's employer, etc., so that further collection action would be simplified. There were further embellishments on the implied promise that money would be disbursed to the customer if the form were completed and returned,[1] and the company's name nowhere appeared on either the form, stub or envelope. But further description is unnecessary. The company never disbursed any money to a customer who returned the form; its intentions were just the reverse. Moreover, the words "U.S.," "Location and Re-Disbursement Dept.," and "Headquarters, Washington 6, D.C.," and the picture of the eagle were obviously all intended to gull a recipient into believing that the promise was coming from a governmental entity. The deceptive nature of the form is obvious and appellants no longer attempt to defend it.[2] What they do say is that the statute under which they were indicted does not apply to them.

That statute was enacted in 1959, after two earlier attempts had failed. It reads in full as follows (18 U.S.C. § 712):

Misuse of names by collecting agencies or private detective agencies to indicate Federal agency

Whoever, *being engaged in the business of collecting or aiding in the collection of private debts or obligations,* or being engaged in furnishing private police, investigation, or other private detective services, uses as part of the firm name of such business, or employs in any communication, correspondence, notice, advertisement, or circular the words "national", "Federal", or "United States", the initials "U.S.", or any emblem, insignia, or name, for the purpose of conveying and in a manner reasonably calculated

1. E. g., an enclosed envelope for sending back the form contained the following: "ATTEN: DISBURSEMENTS CLERK."

2. At trial, counsel for the company lamely argued that since the post office box numbers of the "U. S. Funds Bureau" and the company were identical, when receiving the fraudulent forms and envelopes "Everyone knew that this was the Boneparth Company and no one else, and they just couldn't possibly not have known it."

to convey the false impression that such business is a department, agency, bureau, or instrumentality of the United States or in any manner represents the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both. [Emphasis added.]

Appellants claim that the statute is aimed at collection agencies[3] and that only such firms are "engaged in the business of collecting or aiding in the collection of private debts." Otherwise, say appellants, "every business attempting to collect its own debts would be covered by the statute" and this was not the intention of Congress.

Appellants' argument is persuasive. Everything about the statute supports their interpretation. Its caption refers to "collecting agencies," a phrase that would not ordinarily suggest businesses merely collecting their own debts. And it strains common sense to say that retail businesses such as furniture and appliance stores, which collect their debts only as a necessary adjunct to their ordinary operations, are "in the business of collecting . . . debts."[4] If such corporations were deemed to be "in the business of collecting . . . debts," what business entity would not be? More important, there would then be no reason for Congress to have inserted that qualifying phrase into section 712. Other statutes directed at misuse of federal government names have no such limitation.[5] Moreover, there is nothing in the legislative history of section 712 to suggest that its sweep was broadly conceived. The statute was apparently enacted as a response to inquiries then plaguing the United States Government from people who had returned forms similar to those used in this case but had not received money.[6] The Treasury Department, which apparently received most of the inquiries, clearly saw the problem as focussed on "the so-called skip-tracing firms."[7] Communications

---

3. We put to one side the obvious additional coverage of "private police, investigation, or other private detective services."

4. The Federal Trade Commission has consistently maintained, with court approval, that representations made in dunning notices by retailers that they are collecting agencies are false. See Dejay Stores, Inc. v. F.T.C., 200 F.2d 865 (2d Cir. 1952) (*per curiam*); In re Wm. H. Wise Co., 53 F.T.C. 408 (1956), aff'd, Wm. H. Wise Co. v. F. T. C., 101 U.S.App.D.C. 15, 246 F.2d 702 (D.C.Cir.) (*per curiam*), cert. denied, 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed.2d 64 (1957).

5. See 18 U.S.C. § 711 ("Whoever . . . uses the character 'Smokey Bear' . . . or the name . . . as a trade name . . . ."); 18 U.S.C. § 709 ("Whoever . . . uses the . . . initials 'F.B.I.' . . . in connection with any . . . publication . . . ."); 18 U.S.C. § 709 ("Whoever uses as a firm or business name . . . the letters 'HUD', 'FHA', . . . ."); 18 U.S.C. § 707 ("Whoever, whether an individual, partnership, corporation or association . . . uses . . . the words '4-H Club' or '4-H Clubs' . . ."). But see 18 U.S.C. § 709 ("Whoever . . . uses the words 'national', 'Federal', 'United States', 'reserve', or 'Deposit

Insurance' as part of the business or firm name of a person [or] corporation . . . engaged in the banking, loan . . . or trust business . . . .").

6. See S.Rep.No.107, 86th Cong., 1st Sess. 2 (1959):

The committee has in its files examples of private collection agency use of printed matter incorporating emblems and the words "United States" in such a manner as to appear to be deliberately designed to convey the false impression that the agency is an instrumentality of the United States.

See also S.Rep.No.2350, 84th Cong., 2d Sess. (1956).

7. See H.R.Rep.No. 874, 86th Cong., 1st Sess. 3 (1959) (Letter of Acting Sec. of Treas. A. Gilmore Flues):

The records of the Department show that private firms engaged in the business of locating the whereabouts of delinquent debtors have been operating under names such as "Treasurer's Office", "Disbursements Office", and "Claims Office", coupled with a Washington, D.C. post office address. . . .

The Department is of the opinion that the above-described forms used by the so-called skip-tracing firms are conceived with the idea of giving the recipient the impression that they emanated

to both the Senate and the House Committees in charge of the bills from the Office of the Attorney-General and from the Federal Trade Commission similarly assumed that the bill covered only such firms and collection agencies.[8] Indeed, in the only reported case we have found involving a prosecution under section 712, the defendant was found to have "conducted a 'skip-tracing' service from an office in the District of Columbia." Wacksman v. United States, 175 A.2d 789, 790 (D.C.Mun.App.1961).

■ We conclude, therefore, that the statute does not reach a merchant collecting his own debts. The odd thing about this case is that the court below apparently agreed with defendants on this point. After the Government had presented its case and defendants renewed motions for dismissal of the indictment, the following colloquy took place:

> The Court: Doesn't this mean that you must be in this business of collecting debts, not just an ordinary business selling furniture or selling automobiles?
>
> Doesn't it mean that it must be a separate business, a separate—
>
> Miss Hynes [for the Government]: Your Honor, I don't think the statute means this must be a separate business. The statute says anyone who is *engaged in the business of collecting debts.*
>
> The Court: No, the statute says whoever, being engaged in the business of collecting debts or aiding in the collection of debts.

from a Government agency and that there are funds due him from the Federal Government. This is particularly true with respect to the use of names such as "Treasurer's Office" and "Disbursements Office", which lead the recipients to believe that the forms were sent by the Office of the Treasurer of the United States or the Division of Disbursement of the Treasury Department. This belief of the Department is borne out by the fact that we have received numerous letters from persons complaining that they had returned the forms, but had not received their money.

Isn't that what it says?

> Miss Hynes: That is correct, your Honor.
>
> The Court: How can you possibly stretch that to reach a furniture store?
>
> Miss Hynes: Your Honor, the testimony of Mr. Boneparth, the president of the furniture store is quite clear.
>
> The Court: He says, "We collect debts." But doesn't every business collect debts?
>
> Miss Hynes: That's correct, but to carry that argument would be that a collection agency is within the purview of the statute while this furniture store, using the same form, is not within the purview of the statute.
>
>   \*   \*   \*   \*   \*   \*
>
> [The Court:] And here Congress says whoever—comma—being in the business of.
>
> Doesn't that right on its face mean that you must be engaged in that business? Every business collects debts if it is going to stay in business.

At the close of defendants' case, similar motions were again made, and the following interchange took place:

> [The Court:] There is nothing in the legislative history to support your interpretation of this. There is nothing in the context of the statute.
>
> There is nothing in the text of it.
>
> There is nothing at all to support it.
>
> The context which it takes in the chapter—your interpretation of it just doesn't stand up.

For example, from December 1956 to December 1958, 2,400 letters of inquiry were received from persons who received these forms. The Department has no alternative but to advise the individuals that the forms were *not issued by a Government agency* and that no violation of the statutes enforced by this Department is involved.

See also S.Rep.No.107, 86th Cong., 1st Sess. 4 (1959).

8. See S.Rep.No.107, 86th Cong., 1st Sess. (1959); H.R.Rep.No.874, 86th Cong., 1st Sess. (1959).

Maybe Congress wanted to do that but it certainly didn't.

Miss Hynes: I think that the purpose of the statute is quite clear and that the narrow interpretation should not be given to the statute.

The Court: I am not giving it a narrow interpretation. I am giving it the interpretation it says.

Nevertheless, instead of entering a judgment of acquittal or dismissing the indictment, the court submitted the case to the jury on the novel theory that the jury could find that defendants used an agent called U.S. Funds Bureau to collect the company's debts and that although the company could not directly commit the crime charged, nonetheless defendants could do so by wilfully causing this alleged agent to do so. 18 U.S. C. § 2(b). On this theory, the jury returned a verdict of guilty.

■ Defendants vehemently argue to us, as they did below, that there was no such entity as the "U.S. Funds Bureau," that the name was fictitious, and that no such "agent" ever existed or was ever "engaged in the business of collecting . . . debts." On appeal, the Government has dropped its earlier broad construction of the statute [9] and adheres to the theory upon which the judge submitted the case to the jury. The Government responds that since defendants created "U.S. Funds Bureau" to deceive purchasers, it cannot now avoid the purpose of the statute by disavowing the existence of its own instrumentality. We believe that defendants have the better of the argument. There never was a "separate fund collecting business labeled U.S. Funds Bureau," the hypothesis on which the judge constructed his charge. The indictment made no such charge, and the Government told the jury in its opening that no such entity

existed. There was no evidence to the contrary. If U.S. Funds Bureau never existed, then there was no person or entity which defendants could have caused to do anything.

Nor is the situation changed by the Government's variation of the theme, which appears to be a theory of estoppel. The question of law for the court was whether the statute applied to an ordinary retail establishment collecting its own debts. If the correct answer to that question is no, then on these facts there was nothing to submit to the jury. The company did not employ a "fictitious debt collection agency." It did use "in any communication . . . the initials 'U.S.' . . . for the purpose of conveying . . . the false impression" that it was a government agency. If doing that rendered it criminally liable under the statute, then any business similarly "conveying . . . the false impression" that it was a government agency by using the initials "U.S." in a communication would also be so affected. That would amount to a construction of the statute that we, and the court below, have rejected. We understand why appellants' collection methods would cause the Government concern and lead to the attempt to hold them criminally liable. But the rewriting of statutes is for Congress not for the courts, particularly when the definition of a crime is involved, see United States v. Weitzel, 246 U.S. 533, 542–543, 38 S.Ct. 381, 62 L.Ed. 872 (1918) (Brandeis, J.). We might wish devoutly that practices like those shown here were criminal even when used by a firm collecting its own debts. But under this statute they are not.

Accordingly, the judgment must be reversed and the indictment dismissed. On this view of the case, we need not deal with appellants' other arguments.

9. The Government states in its brief, at p. 8:

> Appellants' argument that the statute does not apply to sellers of merchandise who are also in the business of collecting their own debts has some sup-

port in the legislative history. Businesses engaged in the collection of their own accounts receivable were of no concern to Congress, and understandably so.